IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MIGUEL COLON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ANDREW SAUL, Commissioner of | : | NO. 18-4781 |
| Social Security[1] | : | |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                              September 26, 2019

Miguel Colon ("Plaintiff") seeks review of the Commissioner's decision denying

his claims for disability insurance benefits ("DIB") and supplemental security income

("SSI"). For the reasons that follow, I conclude that the decision of the Administrative

Law Judge ("ALJ") denying benefits is not supported by substantial evidence and will

remand the case for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## I.      PROCEDURAL HISTORY

Plaintiff protectively filed for DIB and SSI on February 19, 2015, claiming that he

became disabled on December 12, 2012, due to depression, fibromyalgia, left shoulder

rotator cuff tear, tendonitis, impingement, cervical degenerative disc disease ("DDD")

with radiculopathy, bilateral carpal tunnel syndrome ("CTS"), diabetes mellitus, asthma,

sleep disturbance, bilateral hip paresthesia, and bicep muscle tear. Tr. at 115, 116, 218,

---

[1]Andrew Saul became the Commissioner of Social Security ("Commissioner") on
June 17, 2019, and should be substituted for the former Acting Commissioner, Nancy
Berryhill, as the defendant in this action. Fed. R. Civ. P. 25(d).

225, 250.[2]  The applications were denied initially, id. 121-25, 126-30, and Plaintiff

requested an administrative hearing before an ALJ, id. at 131, which took place on March

23, 2017.  Id. at 35-88.  On August 8, 2017, the ALJ found that Plaintiff was not

disabled.  Id. at 19-30.  The Appeals Council denied Plaintiff's request for review on

September 14, 2018, id. at 1-3, making the ALJ's August 8, 2017 decision the final

decision of the Commissioner.  20 C.F.R. §§ 404.981, 416.1472.

Plaintiff commenced this action in federal court on November 5, 2018.  Doc. 1.

The matter is now fully briefed and ripe for review.  Docs. 15, 17-18.[3]

## II.   LEGAL STANDARD

To prove disability, a claimant must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for . . . not less than twelve

months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process,

evaluating:

> 1.      Whether the claimant is currently engaged in
> substantially gainful activity;
>
> 2.      If not, whether the claimant has a "severe impairment"
> that significantly limits his physical or mental ability to
> perform basic work activities;

---

[2]Plaintiff filed a prior application for DIB in January 2012.  Tr. at 90, 239.  That application was denied initially and by an ALJ, and the Appeals Council denied Plaintiff's request for review.  Id. at 90.  He did not seek judicial review.

[3]The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  See Standing Order, In RE:  Direct Assignment of Social Security Appeal Cases to Magistrate Judges (Pilot Program) (E.D. Pa. Sept. 4, 2018); Doc. 7.

3. If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;

4. If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform his past work; and

5. If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of his age, education, work experience, and RFC. See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999). Therefore, the issue in this case is whether there is substantial evidence to support the Commissioner's conclusions that Plaintiff is not disabled and is capable of performing jobs that exist in significant numbers in the national economy. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla." Zirnsak, 777 F.2d at 610 (quoting Rutherford v. Barnhart, 399

F.3d 546, 552 (3d Cir. 2005)).  The court has plenary review of legal issues.  <u>Schaudeck</u>,

181 F.3d at 431.

## III.    <u>DISCUSSION</u>

### A.    <u>ALJ's Findings and Plaintiff's Claims</u>

The ALJ found that Plaintiff suffered from several severe impairments at the

second step of the sequential evaluation; cervical and lumbar DDD, bilateral hip

degenerative joint disease, CTS, left shoulder rotator cuff tear, depression, and post-

traumatic stress disorder ("PTSD").  <u>Tr.</u> at 21.  The ALJ found that Plaintiff did not have

an impairment or combination of impairments that met the Listings, <u>id.</u> at 22, and that

Plaintiff retained the RFC to perform light work with the abilities to sit for six hours,

stand for four hours, and walk for four hours during the workday; frequently operate

bilateral foot controls; occasionally climb ramps and stairs, balance, stoop, crouch, and

reach with his non-dominant upper left extremity; never kneel, crawl, or climb ladders,

ropes, or scaffolds; avoid all exposure to unprotected heights or moving mechanical

parts; with a limitation to perform simple, routine, repetitive tasks involving no more than

occasional interaction with the public and no more than few workplace changes; with no

ability to work at a production rate pace or meet strict quota requirements, but able to

meet all end-of-day goals.  <u>Id.</u> at 23.  At the fourth step of the evaluation, the ALJ found

that Plaintiff could not perform his past relevant work as a maintenance supervisor or a

store laborer.  <u>Id.</u> at 28.  However, at the fifth step, the ALJ found, based on the testimony

of a vocational expert ("VE"), that Plaintiff could perform work that exists in significant

numbers in the national economy, including jobs as an agricultural produce sorter and conveyor line bakery worker.  Id. at 29.

Plaintiff claims that the ALJ (1) failed to properly consider the opinions of treating physician Erica Coulter, M.D., and consultative examiner Roger Boatwright, M.D., (2) failed to adequately explain his finding that Plaintiff did not medically equal the Listings, (3) failed to explain his implicit rejection of testimony from lay witness Sally Ortiz, and (4) unreasonably relied on VE testimony.  Doc. 14 at 4-17.  Defendant responds that the ALJ properly considered the medical opinions and evidence and substantial evidence supports the ALJ's decision.  Doc. 17 at 16-30.  In his reply brief, Plaintiff reiterates the arguments in his opening brief.  Doc. 18.[4]

## B.    Summary of Medical Evidence

The notes in the record from Plaintiff's primary care physician, Erica L. Coulter, M.D., begin in November 2013, when she was treating Plaintiff for atypical chest pain for which the doctor recommended a stress test; type II diabetes mellitus for which he was prescribed Lantus Solostar and Apidra Solastar[5] and participated in a diabetes group;

---

[4]Additionally, Plaintiff challenges the authority of the ALJ under Lucia v. S.E.C., __ U.S. __, 138 S. Ct. 2044 (2018), and Defendant seeks a stay pending a decision by the Third Circuit Court of Appeals on the applicability of Lucia in the context of social security disability appeals.  Lucia and the stay motion will be addressed in the last discussion section of this opinion.

[5]Lantus Solostar Pen is a long-acting insulin used to improve blood sugar control in those with type 1 or type 2 diabetes.  See https://www.drugs.com/mtm/lantus-solostar-pen.html (last visited Sept. 18, 2019).  Apidra is an injection that contains insulin glulisine, a fast-acting insulin.  See https://www.drugs.com/search.php?searchterm=Apidra+solastar (last visited Sept. 18, 2019).

CTS of the right hand[6] for which she referred him to an orthopedist; chronic left shoulder pain for which chiropractic treatment had offered limited improvement; hypertension for which he took lisinopril;[7] and arthralgias due to depression, fibromyalgia,[8] and osteoarthritis. <u>Tr.</u> at 907-08. In January 2014, Dr. Coulter recommended Plaintiff consult with an orthopedist regarding his left shoulder pain because an MRI showed diffuse tendonosis of the rotator cuff.[9] <u>Id.</u> at 897. Also in January 2014, Plaintiff complained of increased bilateral hip pain for which Dr. Coulter prescribed Tylenol with codeine. <u>Id.</u> at 891.

On February 21, 2014, following a three-year history of neck and left shoulder, arm, and hand pain, Plaintiff underwent a left carpal tunnel release and left shoulder arthroscopy.[10] <u>Tr.</u> at 339, 361. During the arthroscopy, Paul F. Carroll, M.D., of

---

[6]CTS is "an entrapment neuropathy characterized by pain and burning or tingling paresthesias in the fingers and hand, sometimes extending to the elbow. Symptoms result from compression of the median nerve in the carpal tunnel." <u>Dorland's Illustrated Medical Dictionary</u>, 32nd ed. (2012) ("<u>DIMD</u>"), at 1824.

Although Dr. Coulter's notes state "EMG showed moderate-severe right [CTS]," <u>tr.</u> at 907, later records indicate Plaintiff had release surgery for the left CTS. <u>Id.</u> at 361.

[7]Lisinopril is an angiotensin converting enzyme inhibitor used to treat high blood pressure. <u>See</u> https://www.drugs.com/lisinopril.html (last visited Sept. 18, 2019).

[8]Fibromyalgia is "pain and stiffness in the muscles and joints that either is diffuse or has multiple trigger points." <u>DIMD</u> at 703.

[9]Tendonosis, also known as tendinosis and tendinopathy, is "any pathologic condition of a tendon." <u>DIMD</u> at 1881.

[10]Arthroscopy refers to the "examination of the interior of a joint with an arthroscope," which is an instrument used for such examination and for carrying out diagnostic and therapeutic procedures within the joint. <u>DIMD</u> at 158, 620.

Orthopedic Associates of Lancaster ("OAL"), also performed a biceps tenotomy and subacromial decompression.[11] Id. at 361-63. Three months after the surgery, Dr. Carroll noted that Plaintiff's sensation in the area was intact, he had a negative Tinel's sign in the left wrist,[12] had full range of motion of the fingers and wrist, was nontender to palpation over the shoulder, had full range of motion without pain in the shoulder with no impingement signs, and had excellent rotator cuff strength. Id. at 391-92. The concurrent physical therapy records also evidence significant improvement after surgery. See id. at 1039-40 (6/30/14 – discharge notes).

Dr. Coulter continued to treat Plaintiff during the same period of his treatment with Dr. Carroll. On May 13, 2014, Dr. Coulter noted that Plaintiff's shoulder pain was improving with physical therapy after surgery and he was no longer taking pain medication. Tr. at 873.

Plaintiff began treatment with Thomas Ring, M.D., at OAL for bilateral hip pain in August of 2014. Tr. at 398-401. The following month, Dr. Ring reviewed an MRI of Plaintiff's pelvis performed on September 4, 2014, which showed degenerative changes

---

[11]Tenotomy is "the surgical cutting of any tendon." DIMD at 1882. The rotator cuff is "a musculotendinous structure, about the capsule of the shoulder joint, formed by inserting fibers of the supraspinatus, infraspinatus, teres minor, and subscapularis muscles, blending with the capsule, and providing mobility and strength to the shoulder joint." Id. at 441. Acromion is "the lateral extension of the spine of the scapula, projecting over the shoulder joint and forming the highest point of the shoulder." Id. at 20. Decompression is "a surgical operation for the relief of pressure in a body compartment." Id. at 475.

[12]Tinel's sign is "a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve. It indicates a partial lesion or the beginning regeneration of the nerve." DIMD at 1716.

of the bilateral hip joints and the bilateral sacroiliac ("SI") joints.  Id. at 408.  He referred

Plaintiff to pain management specialist Jeffrey Conly, M.D., id., who performed two SI

joint steroid injections on September 18, 2014.  Id. at 426.  The following month,

Plaintiff complained of worsening hip pain with walking and extended periods of sitting.

Id. at 427.  An MRI performed on October 10, 2014, revealed no herniation or stenosis,

but "a mild annular bulge at L3-L4 and less so at L4-L5," id. at 437, 680, and Plaintiff

was referred for physical therapy.  Id. at 437.  In October 2014, Dr. Coulter noted that

Plaintiff had been diagnosed with sacroiliitis and was "doing better after injections."  Id.

at 867.

On October 31, 2014, Plaintiff began complaining of vertigo and tension

headaches, for which Dr. Coulter prescribed Zofran and meclizine[13] and added benign

positional vertigo treatment to his physical therapy plan.  Tr. at 861.[14]  In February 2015,

the doctor noted Plaintiff's complaints of intermittent paresthesia in his legs causing his

---

[13]Zofran is used to prevent nausea and vomiting.  See
https://www.drugs.com/zofran.html (last visited Sept. 18, 2019).  Meclizine is an
antihistamine used to treat or prevent nausea, vomiting, and dizziness caused by motion
sickness and to treat symptoms of vertigo caused by disease affecting the ear.  See
https://www.drugs.com/meclizine.html (last visited Sept. 18, 2019).

[14]Plaintiff began treatment at Otolaryngology Physicians of Lancaster on
November 22, 2016, complaining of lightheadedness and nausea.  Tr. at 1091.  Victor M.
Da Costa, M.D., diagnosed Plaintiff with right side benign positional vertigo, performed
the Epley Maneuver, and ordered a video nystagmography ("VNG"), a test that records
the movements of the eyeball.  Id. at 1091-95; DIMD at 1307.  Plaintiff could not tolerate
the VNG, but the partial results had no negative findings.  Id. at 1114.  Dr. Da Costa
diagnosed Plaintiff with Meniere's disease (hearing loss, tinnitus, and vertigo resulting
from nonsuppurative disease of the labyrinth with edema) and vestibular disequilibrium
and referred him to vestibular rehabilitation.  Id. at 1117; DIMD at 539.

legs to buckle from weakness and pain for which Dr. Coulter wanted an EMG of his legs and was considering a referral to Dr. Conly.  Id. at 848.

In June 2015, Plaintiff returned to Dr. Conly, complaining of worsening pain in the prior few weeks for which Dr. Conly recommended medial and lateral branch block injections at L5, S1, and S2, tr. at 1060, which were performed on June 24, 2015.  Id. at 1065.  The records indicate that these injections provided complete relief for a week and a half, after which the pain returned.  Id. at 1061, 1065.  Dr. Conly referred Plaintiff to orthopedic surgeon Carl Adolph, M.D.  Id. at 1064.

On August 18, 2015, Dr. Adolph performed a left SI joint fusion.  See tr. at 1074. X-rays performed on January 22, 2016 showed a stable instrumented left SI joint fusion. Id. at 1143.  On the same date, physician's assistant Christina Bulley noted that Plaintiff "ha[d] no complaints for his left SI joint," but he complained of pain in his right SI joint. Id. at 1144.  On February 9, 2016, Dr. Adolph performed a right SI joint fusion.  Id. at 1152.  Follow up X-rays showed the bilateral SI joint fusions had "no evidence of any complications."  Id. at 1154, 1155.  Thirteen days after surgery, Plaintiff reported a "constant sharp pain that radiate[d] over the posterior aspect of the leg to his foot," and increased pain with walking, sitting, and laying down.  Id. at 1156.

On March 21, 2016, Plaintiff reported to Dr. Adolph that his lower leg pain was gone, and that he had mild discomfort in the posterior right "glute" area but did not need any prescription or over-the-counter pain medications.  Tr. at 1159.  On May 27, 2016, Plaintiff complained of "some pain at times if he stands for long periods or walks long distance," and occasional discomfort in his right buttock and weakness in his shoulder.

Id. at 1163.  On examination, the doctor noted deconditioning, but no significant limp, and weakness in the left arm around the shoulder girdle.  Id. at 1165.

Plaintiff saw Dr. Carroll again on November 16, 2015, complaining of pain and locking in his right index and ring fingers and his left index and middle fingers, for which Dr. Carroll performed cortisone injections on the left hand.[15]  Tr. at 1131-32.  On December 17, 2015, physician assistant ("PA") Rene Battista indicated that Plaintiff had no improvement in the symptoms of his left hand and orthopedic surgeon Vincent Battista, M.D., noted triggering[16] in the two fingers on the left hand and in Plaintiff's right ring finger.  Id. at 1137, 1138.  Dr. Battista performed release surgery on Plaintiff's left index and middle fingers and on his right ring finger.  Id. at 1141, 1142, 1171-72 (12/29/15 - operative report, left middle and index fingers), 1169 (1/8/16 - operative report, right ring finger).  Three weeks later, Dr. Battista noted that Plaintiff was progressing well with no numbness or tingling, but did complain of pain in his right ring finger and left middle finger and mild difficulty with flexion in both hands.  Id. at 1142.  On February 29, 2016, PA Battista noted that Plaintiff had stiffness but no pain in both hands and normal strength in both hands.  Id. at 1158.

---

[15]Cortisone is a steroid used to treat inflammation caused by allergic disorders, skin conditions, ulcerative colitis, arthritis, lupus, psoriasis, or breathing disorders.  See https://www.drugs.com/mtm/cortisone.html (last visited Sept. 18, 2019).

[16]The term trigger finger is used to describe "a finger liable to have a momentary spasmodic arrest of flexion or extension followed by a snapping into place, due either to stenosing tenosynovitis or to a nodule in the flexor tendon."  DIMD at 708.

On October 6, 2016, during a recheck of his earlier trigger finger releases, Plaintiff complained to Dr. Battista of pain and an inability to fully flex his left ring finger and thumb and his right middle finger.  Tr. at 1176.  On examination, Dr. Battista noted triggering of these three fingers.  Id. at 1178.  On October 11, 2016, Dr. Battista performed release surgery on the left ring finger and thumb, and a steroid injection of the right middle finger.  Id. at 1167, 1181.  Plaintiff's left hand was doing "nicely" at his follow up appointment on December 1, 2016, and Plaintiff was preparing for release surgery for the right index and middle fingers, which was completed on December 16, 2016.  Id. at 1181-82, 1183.  Plaintiff was "doing well" at his follow up appointment on December 29, 2016.  Id. at 1183.

In addition to the issues with his shoulder, hips, and hands, Plaintiff was admitted to Lancaster General Hospital on June 4, 2016, with complaints of dizziness and edema. Tr. at 1423.  On discharge, he was diagnosed with chronic kidney disease.  Id.  Renal function improved during the course of his two-day admission.  Id.

Roger Boatwright, M.D., conducted an examination at the request of the Administration on June 8, 2015.  Tr. at 946-50.  Dr. Boatwright noted that, although Plaintiff's gait was normal, he was unable to walk on heels and toes, and could perform only a half-squat due to his low back and hip pain.  Id. at 948.  On examination, the doctor found tenderness in both SI joints and from L1 to L5.  Id.  The doctor diagnosed Plaintiff with depression, fibromyalgia, type 2 diabetes, asthma, sleep apnea, hypercholesterolemia, hypertension, history of left shoulder rotator cuff tear, bilateral hip

paresthesias, and bilateral CTS.  Id. at 949.  In an attached range of motion chart, the doctor indicated limited range of motion of the lumbar spine.  Id. at 958.

Dr. Boatwright also completed a Medical Source Statement of Ability to do Work-Related Activities, finding Plaintiff could frequently lift twenty pounds and occasionally carry twenty pounds.  Tr. at 951.[17]  The doctor also found that Plaintiff could sit for four hours (thirty minutes at one time), and stand and walk for two hours each (ten minutes at a time) in an eight-hour day.  Id. at 952.  Dr. Boatwright found Plaintiff was limited to occasional use of his left hand to reach, handle, finger, feel, and push/pull.  Id. at 953.

Plaintiff's primary care physician, Dr. Coulter, completed a Medical Source Statement of Ability to do Work-Related Activities regarding Plaintiff's physical impairments on April 7, 2017, finding that Plaintiff could occasionally lift and carry up to twenty pounds, frequently reach with either hand, occasionally reach overhead with either hand, never handle, finger, feel, or push/pull with either hand, and occasionally use foot controls, climb stairs and ramps, and crawl.  Id. at 1346-48.[18]  The doctor indicated that Plaintiff's use of a cane was medically necessary.  Id. at 1347.

---

[17]The form has four categories indicating how often the individual can perform the activity:  Never, Occasionally (up to one-third of the time), Frequently (from one-third to two-thirds of the time), and Continuously (more than two-thirds of the time).  Tr. at 951.

[18]There is some confusion in the form regarding Plaintiff's ability to sit, because the doctor indicated that Plaintiff could sit for a total of forty-five minutes in an eight-hour day, but could sit one hour at a time without interruption.  Tr. at 1347.  Plaintiff could stand for thirty minutes at a time and in a day, and could walk thirty minutes at a time for a total of one hour a day.  Id.

Plaintiff began mental health treatment at Community Services Group ("CSG") on October 4, 2013, at which time Lillian Pacheco, M.Ed., diagnosed Plaintiff with major depressive disorder ("MDD"), single episode, mild[19] and PTSD.[20] Tr. at 830. On October 13, 2013, psychiatrist Hector Diaz, M.D., concurred in the diagnoses, noting a history of chronic depression and trauma, and found that Plaintiff had a Global Assessment of Functioning ("GAF") score of 55.[21] Id. at 1215-17. On mental status exam ("MSE"), the doctor indicated that Plaintiff was in "mild to moderate distress" and

_____

[19]The essential feature of MDD is a clinical course that is characterized by one or more major depressive episodes. Diagnostic and Statistical Manual of Mental Disorders, 5th ed. (2013) ("DSM-5"), at 160-61. A major depressive episode is a period of at least two weeks during which there is either depressed mood or the loss of interest or pleasure in nearly all activities. Id. at 163.

[20]"The essential feature of [PTSD] is the development of characteristic symptoms following exposure to one or more traumatic events. . . . The clinical presentation of PTSD varies. In some individuals, fear-based reexperiencing, emotional, and behavioral symptoms may predominate. In others, anhedonic or dysphoric mood states and negative cognitions may be most distressing. In some other individuals, arousal and reactive-externalizing symptoms are prominent, while in others, dissociative symptoms predominate. Finally, some individuals exhibit combinations of these symptom patterns." DSM-5 at 274.

[21]A GAF score is a measurement of a person's overall psychological, social, and occupational functioning, and is used to assess mental health. Diagnostic and Statistical Manual of Mental Disorders, 4th ed. Text Revision (2000), at 34. A GAF score of 51 to 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) [or] moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Id. Although the fifth edition of the DSM eliminated reference to the GAF score, the Commissioner continues to receive and consider GAF scores in medical evidence, see Administrative Message-13066 (July 22, 2013), and an ALJ must consider a GAF score with all of the relevant evidence in the case file. Nixon v. Colvin, 190 F.Supp.3d 444, 447 (E.D. Pa. 2016)).

tearful at times, his affect was restricted, and he had "fairly good insight" and sound judgment.  Id. at 1216.  On October 16, 2013, the doctor recommended increasing tricyclic antidepressants (at the time Plaintiff was taking amitriptyline) and replacing trazodone with mirtazapine.[22]  Id. at 816.  Two weeks later, the doctor noted that Plaintiff reported sleeping a lot but was tired during the day and saw no improvement in his mood, complaining of being withdrawn, apathetic, and irritable.  Id. at 811.  Doctor Diaz increased the dosage of amitriptyline and added bupropion[23] to Plaintiff's regimen.  Id.

Plaintiff continued seeing Dr. Diaz monthly for medication management complaining of insomnia, depression, and irritability.  Tr. at 808 (11/21/13), 806 (12/18/13), 803 (1/28/14).  In March 2014, the doctor noted that Plaintiff complained of only some difficulty sleeping due to pain and indicated that his moods were relatively stable.  Id. at 799.  In August 2014, Plaintiff complained of irritability, apathy, and withdrawal.  Id. at 792.  On MSE, the Dr. Diaz noted that Plaintiff's mood was sad, and insight and judgment were fair.  Id. at 793.  The doctor noted improvement in Plaintiff's December 24, 2014 MSE, indicating that Plaintiff's mood was good and specifically noting that Plaintiff and his wife stated that he was interacting more and not as irritable.

---

[22]Amitriptyline is a tricyclic antidepressant.  See https://www.drugs.com/amitriptyline.html (last visited Sept. 18, 2019).  Trazodone is an antidepressant used to treat MDD, improving mood, appetite, energy level, and decreasing anxiety and insomnia related to depression.  See https://www.drugs.com/trazodone.html (last visited Sept. 18, 2019).  Mirtazapine is an antidepressant used to treat MDD.  See https://www.drugs.com/mirtazapine.html (last visited Sept. 18, 2019).

[23]Bupropion is an antidepressant used to treat MDD.  See https://www.drugs.com/bupropion.html (last visited Sept. 18, 2019).

14

Id. at 778.  Plaintiff experienced some sedation from his medications but preferred not to change them.  Id.  The notes for February 16, 2015, indicate that Plaintiff's depression, withdrawal, and irritability had returned.  Id. at 774.  Dr. Diaz added Cytomel[24] to Plaintiff's regimen.  Id. at 776.

On March 10, 2015, Plaintiff stated that he noticed progress with his moods with Cytomel and felt "much improved."  Tr. at 1308.  In August 2015, Jonathan Benaknin, M.D., another psychiatrist at CSG, planned to add prazosin[25] to Plaintiff's medications to address complaints of nightmares.  Id. at 1302.  In November 2015, the doctor noted an increase in depression coinciding with Plaintiff's stopping medications in preparation for surgery.  Id. at 1297.  In March 2016, after sacral fusion surgery, Dr. Benaknin noted that Plaintiff had no depression or anxiety.  Id. at 1290.  On May 23, 2016, Dr. Benaknin added hydroxyzine to address Plaintiff's complaints of anxiety, Ambien to address Plaintiff's insomnia, and also Wellbutrin.[26]  Id. at 1286-88.  On July 7, 2016, Dr. Benaknin did not note any new psychiatric symptoms.  Id. at 1285.  In September 2016,

---

[24]Cytomel is a man-made form of a hormone naturally produced by the thyroid gland to regulate the body's energy and metabolism.  See https://www.drugs.com/mtm/cytomel.html (last visited Sept. 18, 2019).

[25]Prazosin is an alpha-adrenergic blocker used to treat hypertension by relaxing the veins and arteries so that blood can more easily pass through them.  See https://www.drugs.com/mtm/prazosin.html (last visited Sept. 18, 2019).

[26]Hydroxyzine (Vistaril) is used as a sedative to treat anxiety and tension.  See https://www.drugs.com/vistaril.html (last visited Sept. 18, 2019).  Ambien is a sedative used to treat insomnia.  See https://www.drugs.com/ambien.html (last visited Sept. 18, 2019).  Wellbutrin is an antidepressant used to treat MDD.  See https://www.drugs.com/wellbutrin.html (last visited Sept. 18, 2019).

the doctor discontinued Vistaril (hydroxyzine) because Plaintiff was diagnosed with kidney disease, added Xanax, and noted only a diagnosis of PTSD.[27]  Id. at 1280.  In October 2016, Plaintiff was "[d]oing well," and his "meds [were] working well with no issues."  Id. at 1274.

On March 28, 2017, Ms. Pacheco completed a Medical Source Statement of Ability to do Work-Related Activities,[28] finding mild limitation in Plaintiff's abilities to understand, remember, and carry out simple instructions, make judgments on simple work-related decisions, and respond appropriately to usual work situations and changes in a routine work setting.  Tr. at 1338-39.  She found moderate impairment in his abilities to understand, remember and carry out complex instructions, make judgments on complex work-related decisions, and interact appropriately with the public, supervisors, and co-workers.  Id. at 1339.  She explained that, as a result of his mental health diagnoses, Plaintiff would have problems with concentration, focus, and memory, and difficulty in controlling his temper or processing information with others.  Id. at 1338-39.

_____

[27] Xanax is a benzodiazepine used to treat anxiety disorders, panic disorders, and anxiety caused by depression.  See https://www.drugs.com/xanax.html (last visited Sept. 18, 2019).

[28] The form requires the medical professional to rate the Plaintiff's abilities on a five-point scale.  "None" means "absent or minimal limitations.  If limitations are present they are transient and/or expected reactions to psychological stresses"; "mild" means "slight limitation in this area, but the individual can generally function well"; "moderate" means "more than a slight limitation in this area but the individual is still able to function satisfactorily"; "marked" means a "serious limitation in this area.  There is a substantial loss of the ability to effectively function"; and "extreme" means a "major limitation in this area.  There is no useful ability to function in this area."  Tr. at 1338.

Dr. Coulter, Plaintiff's primary care physician, also completed a Medical Source Statement of Ability to do Work-Related Activities related to Plaintiff's mental abilities, finding that Plaintiff had no limitation in understanding, remembering, and carrying out simple instructions, and the ability to make judgments on simple work-related decisions. Tr. at 1342. She found marked limitation in Plaintiff's abilities to understand, remember, and carry out complex instructions, and to make judgments on complex work-related decisions. Id. Dr. Coulter found that Plaintiff's impairments did not affect his ability to interact appropriately with others and respond to changes in the routine work setting. Id. at 1343.

Finally, on May 6, 2015, based on a review of the record at the initial determination stage, Jonathan Rightmyer, Ph.D., concluded that Plaintiff suffered from affective disorder and anxiety disorder. Tr. at 107. In the area of concentration, Dr. Rightmyer found no significant limitation in Plaintiff's abilities to understand, remember, and carry out short and simple instructions, remember locations and work-like procedures, perform activities with a schedule, maintain regular attendance, be punctual, sustain an ordinary routine without special supervision, work in coordination with or in close proximity to others, and make simple work-related decisions. Id. at 97-98. He found moderate limitation in Plaintiff's abilities to understand, remember, and carry out detailed instructions, and maintain attention and concentration for extended periods. Id. at 98. In the area of social interaction, the doctor found no significant limitation in the abilities to ask simple questions or request assistance, accept instruction and respond to

supervisors, get along with coworkers, and maintain socially appropriate behavior, and moderate limitation in Plaintiff's ability to interact with the public. Id. at 98-99.

### C.    Other Evidence

Plaintiff was born on February 4, 1971. Tr. at 225. He speaks Spanish, testified at the administrative hearing that he can speak English, but utilized the services of an interpreter during the hearing. Id. at 37-38, 249-51. He completed the ninth grade, but later received a high school diploma from a Christian Ministries school. Id. at 251. He has past work experience including maintenance supervisor, building maintenance/repairman, and store laborer. Id. at 41-46, 78-80, 252.

Plaintiff testified that his diabetes is not well-controlled due to his diet and his medications. Tr. at 46-47. As a result, he has nerve damage in his legs and blurry vision. Id. at 47-48. Plaintiff uses an inhaler twice a day for his asthma and uses a nebulizer when his asthma symptoms are aggravated. Id. at 48-49. Plaintiff stated that his depression causes him to stay in the house at night and also difficulty with sleep that is not helped by medication. Id. at 48-50. Although Plaintiff underwent injections and fusion surgery, he continues to suffer from the feeling of pins and needles in his legs, from his buttocks to his ankles. Id. at 51-52. He has difficulty with self-care and hygiene because he cannot bend down and he cannot put on socks and shoes. Id. at 71. Although the doctor told Plaintiff to wean himself off using a cane, Plaintiff explained that his knees buckle and he does not have the strength to walk without the cane. Id. at 54-55.

Plaintiff also explained that he does not have full strength in his left hand due to his shoulder surgery. Tr. at 57. He does not use the left hand to lift anything. Id. at 58.

He claims that the surgeries to his hands for the trigger fingers failed because he cannot even button a shirt or tie his shoes.  Id. at 70.  Plaintiff also testified that he had recently begun having pain in his neck and right shoulder.  Id. at 59-60.[29]

Plaintiff said that on an average day he will get up, brush his teeth, take his medication, and wait for his wife to cook something.  Tr. at 64.  He spends most of his time in his room lying down and does not help around the house.  Id. at 64, 69.  Plaintiff explained at the hearing that he isolates himself.  For example, although his mother lives next door, he sees her infrequently.  Id. at 69.  Plaintiff also stated that he "get[s] heated quick" meaning that he gets agitated easily.  Id.

Sally Ortiz, whom Plaintiff referred to has his wife, tr. at 64, also testified at the hearing.  Id. at 74-77, 249.[30]  Ms. Ortiz confirmed that Plaintiff spends most of his time in his room and does not come out unless she tells him to do something, and that he does not go out even to see his mother next door.  Id. at 74-76.  She said that he cries every day and is argumentative.  Id. at 76-77.

---

[29]Although Plaintiff also claimed to suffer from fibromyalgia, counsel explained at the hearing that Plaintiff was not receiving treatment for fibromyalgia and had not seen a rheumatologist since 2013.  Tr. at 60.

[30]Plaintiff and Ms. Ortiz are not married but have lived together for 27 years and have a grown son.  Tr. at 66-67.

**D.**    **Consideration of Plaintiff's Claims**

    1.    Consideration of Opinion Evidence

Plaintiff first argues that the ALJ improperly rejected certain aspects of the opinions of Drs. Coulter and Boatwright. Doc. 14 at 4-11. Defendant responds that substantial evidence supports the ALJ's evaluation of the medical opinion evidence. Doc. 17 at 16-22.

Generally, the governing regulations dictate that an ALJ must give medical opinions the weight he deems appropriate based on factors such as whether the physician examined or treated the claimant, whether the opinion is supported by medical signs and laboratory findings, and whether the opinion is consistent with the record as a whole. 20 C.F.R. §§ 404.1627(c), 416.927(c).[31] "The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects." Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citing Stewart v. Sec'y HEW, 714 F.2d 287, 290 (3d Cir. 1983)). "When a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Id. (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)).

The ALJ's consideration of the opinion evidence is flawed. Dr. Coulter's April 7, 2017 assessment included significant manipulative limitations, indicating that Plaintiff could occasionally reach overhead and frequently reach in all other directions, and could

---

[31]Although the regulations governing the consideration of medical evidence have been amended, the standards I rely on for this discussion are those used for consideration of claims filed prior to March 27, 2017.

never handle, finger, feel, or push/pull with either hand.  Tr. at 1348.  The doctor

explained that Plaintiff's severe bilateral CTS and trigger fingers "prohibit fine motor

skills."  Id.  The ALJ gave moderate weight to Dr. Coulter's assessment, but disagreed

with her findings regarding limitations relating to the use of Plaintiff's hands.

> The undersigned gives moderate weight to the April 2017
> opinion of Erica Coulter, MD, [Plaintiff's] primary care
> physician, indicating [Plaintiff] capable of a range of light
> exertional work activity ([Tr. at 1346-51]).  Though the
> opinion remains generally consistent with [Plaintiff's]
> longitudinal objective signs, clinical findings, and treatment
> history, the undersigned finds [Plaintiff] less limited than
> opined by Dr. Coulter in his ability to perform bilateral
> manipulative activities . . . .  Though the record demonstrates
> [Plaintiff] suffered from a history of bilateral [CTS], the
> record shows [Plaintiff] underwent a successful right carpal
> tunnel release more than 10 years ago and underwent a
> successful left carpal tunnel surgery in 2014.  Since 2014, the
> record has demonstrated little evidence of ongoing complaints
> of carpal tunnel restrictions or functional limitations and
> reveals [Plaintiff] has not required any ongoing care for his
> alleged condition.

Id. at 26.

Although the ALJ addressed Plaintiff's bilateral CTS in addressing the

manipulative limitations Dr. Coulter found, he overlooked Plaintiff's more recently

diagnosed trigger fingers.  On November 16, 2015, more than a year after his left carpal

tunnel surgery, Plaintiff reported to orthopedic surgeon Dr. Carroll that he was suffering

from pain and locking in his left index and middle finger on the left hand and his right

index and ring finger for the prior year.  Tr. at 1132.  Dr. Carroll noted on orthopedic

examination that Plaintiff had "tenderness over the A1 pulley of the left index and middle

finger[,] limited flexion and locking with passive extreme flexion of those 2 fingers[,

and] minimal tenderness over the index finger and tenderness and locking of the ring finger [on the right hand]." Id. Plaintiff was diagnosed with trigger fingers on both hands and Dr. Battista performed release surgery for Plaintiff's left middle and index fingers in December 2015, and of his right ring finger in January 2016. Id. at 1169, 1171-72.

In addition, in October 2016, Plaintiff began complaining of pain and an inability to flex his ring finger and thumb on his left hand and the middle finger and index finger on his right hand. Tr. at 1176, 1181. Dr. Battista diagnosed additional trigger fingers and performed release surgery on the left hand in October 2016, and on the right in December 2016. Id. at 1167, 1181, 1183. In post-operative follow up in December 2016, physician assistant Eric Thompson in Dr. Battista's office noted that Plaintiff was "working on finger range of motion exercises." Id. at 1183. Thus, at the time of Dr. Coulter's assessment, Plaintiff had been complaining of and receiving treatment for multiple trigger fingers on both hands in the prior year, which could account for the manipulative limitations noted in her assessment.

In the above-quoted analysis of Dr. Coulter's opinions, the ALJ failed to acknowledge Plaintiff's trigger fingers in any way -- not the symptomatology, the diagnosis, nor the treatment he underwent. The ALJ compounded his failure in this regard by failing to mention the trigger fingers at any point in his decision despite discussion of the trigger fingers at the administrative hearing. See tr. at 59. Thus, it is unclear whether the ALJ discounted or simply overlooked the medical records regarding Plaintiff's trigger fingers, and I will remand the case for further consideration of the

medical record and the opinion evidence.  See Burnett v. Comm'r of Soc. Sec., 220 F.3d

112, 121 (3d Cir. 2000) ("In the absence of [an indication of which evidence the ALJ

rejects and his underlying reasoning] the reviewing court cannot tell if significant

probative evidence was not credited or simply ignored.").  Proper consideration of the

medical evidence regarding Plaintiff's manipulative limitations is crucial because the VE

stated that the occupations he identified "would not be precluded as long as there was

[sic] no limitations with the dominant upper extremity with respect to reaching, handling,

fingering or grasping."  Tr. at 84.

The ALJ's consideration of Dr. Boatwright's June 8, 2015 assessment suffers from

the same flaw.  Dr. Boatwright concluded from his examination that Plaintiff suffered

from manipulative limitations of the left hand such that he could only occasionally use

the left hand for reaching, handling, fingering, feeling, and pushing/pulling.  Tr. at 953.[32]

The ALJ rejected these manipulative limitations noting that although "the record shows

[Plaintiff] had some problems with his left arm, [Plaintiff's] clinical findings

demonstrated only a loss of range of motion, not fine manipulation in that hand."  Id. at

---

[32]Considering the timing of Dr. Boatwright's assessment, the fact that he found
manipulative limitations in only Plaintiff's left hand is consistent with the medical record.
As previously noted, on November 16, 2015, five months after Dr. Boatwright's
examination, Plaintiff complained to Dr. Carroll of pain and locking in his left index  and
middle finger and his right index and ring finger that began a year earlier.  Tr. at 1132.
Dr. Carroll noted that the pain and tenderness of the fingers on the right hand were
minimal compared to the left.  Id.

26.  Again, the ALJ ignored or overlooked the evidence regarding Plaintiff's trigger fingers, or else he rejected it without explanation.[33]

In this section of his brief, Plaintiff also challenges the ALJ's rejection of certain environmental limitations attributable to Plaintiff's asthma.  The ALJ adequately explained his decision in this regard, noting that "the record does not demonstrate [that Plaintiff] has required more than minimal treatment or care for his condition and the record shows little evidence that [Plaintiff's] asthma results in more than minimal restrictions on [his] ability to perform work-related functional activities."  Tr. at 26.  This conclusion is supported by substantial evidence.

## 2.    Listings Analysis

Plaintiff next argues that the ALJ did not adequately explain his finding that Plaintiff does not medically equal the Listings, focusing on the "B" criteria of the applicable mental health Listings.  Doc. 14 at 11.  Specifically, Plaintiff argues that the ALJ failed to consider what effect Plaintiff's physical impairments had on the limitations imposed by his mental impairments.  Id. at 12-13.  Defendant responds that the ALJ properly considered Plaintiff's impairments in his Listings analysis and that no doctor has opined that Plaintiff's physical impairments impose any additional mental limitations.  Doc. 17 at 22-26.

---

[33]On remand, the ALJ should also revisit Plaintiff's need for the use of a cane.  In his decision, the ALJ notes that Plaintiff's physicians attempted to wean him off the use of a cane.  Tr. at 25 (citing id. at 1160 – Dr. Adolph treatment note dated 3/21/16).  However, in her assessment dated April 7, 2017, Dr. Coulter indicated that Plaintiff required a cane to ambulate.  Id. at 1347.

To establish disability at step three of the sequential evaluation, a claimant's impairments must meet or medically equal the Listings.

> If you have a combination of impairments, no one of which meets a listing . . . , we will compare your findings with those for closely analogous listed impairments. If the findings related to your impairments are at least of equal medical significance to those of a listed impairment, we will find that your combination of impairments is medically equivalent to that listing.

20 C.F.R. §§ 404.1526(b)(3); 416.926(b)(3). With respect to the relevant mental health Listings, in order to meet the "B" criteria, a claimant must establish that his impairments result in extreme limitation in one, or marked limitation in two, of the areas of mental functioning (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; adapt or manage oneself). 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(F)(2). In conducting this analysis, the ALJ must determine whether Plaintiff's impairments in combination medically equal the Listings. Torres v. Comm'r of Soc. Sec., 279 F. App'x 149, 151 (3d Cir. 2008).

Here, the ALJ found that Plaintiff had mild limitations in understanding, remembering, or applying information; moderate limitation in interacting with others and in concentrating, persisting, or maintaining pace; and no limitation in adapting or managing oneself. Tr. at 22. In addressing the Listings relevant to Plaintiff's mental health impairments, the ALJ stated that "[t]he severity of [Plaintiff's] mental impairments, considered singly and in combination, do not meet or medically equal the criteria of Listings 12.04 and 12.15." Id. It is unclear from this language whether the ALJ considered Plaintiff's physical impairments in combination with his mental health

25

impairments in analyzing the mental health Listings, specifically the "B" criteria of the mental health Listings. Thus, remand is necessary. Moreover, as previously discussed, the ALJ failed to consider evidence relating to Plaintiff's trigger fingers and must consider the combination of all of Plaintiff's impairments in conducting a Listings analysis.

### 3. Consideration of Lay Evidence

Plaintiff also argues that the ALJ failed to explain his implicit rejection of Ms. Ortiz's testimony. Doc. 14 at 15. Defendant responds that substantial evidence supports the ALJ's decision notwithstanding the evidence presented by Ms. Ortiz. Doc. 17 at 26-27.

Because I have already determined that the case must be remanded for further consideration of the medical and opinion evidence, and reconsideration of the evidence may impact consideration of this testimony, I need not discuss this claim in great length. Although the ALJ discussed Ms. Ortiz's testimony, see tr. at 24, he did not explain if and to what extent he credited her testimony. Social Security ruling 06-03p offers guidance in the consideration of evidence offered by lay witnesses.

> [T]he adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

S.S.R. 06-03p, "Titles II and XVI: Considering Opinions and Other Evidence from Sources who are not "Acceptable Medical Sources" in Disability Claims; Considering

Decisions on Disability by Other Governmental and Nongovernmental Agencies, 2006 WL 2329939, at *6 (Aug. 9, 2006). On remand, the ALJ shall reconsider Ms. Ortiz's testimony and evidence and provide an explanation of the weight he has given it.

4. VE Testimony

Finally, Plaintiff complains that the occupations identified by the VE are not suitable for the limitations propounded by the ALJ and the VE's testimony was in conflict with the Dictionary of Occupational Titles. Because reconsideration of the medical, opinion, and lay evidence may impact the ALJ's RFC determination, I need not address Plaintiff's specific complaints regarding the VE testimony at this point. On remand, the ALJ shall obtain additional vocational evidence to establish Defendant's burden at step five of the sequential analysis.

5. Lucia

Plaintiff also alleges that the ALJ who adjudicated his application was not appointed in a manner consistent with the Appointments Clause rendering the decision invalid under Lucia v. SEC, __ U.S. __, 138 S. Ct. 2044 (2018). Doc. 14 at 2-4. I have already determined that the matter must be remanded. Considering that the Commissioner has rectified the appointment of all ALJ's, see S.S.R. 91-1p, Titles II and XVI: Effect of the Decision in Lucia v. Securities and Exchange Commission (SEC) on Cases Pending at the Appeals Council, 2019 WL 120203, at *1 (March 15, 2019), I need not address Plaintiff's claim regarding Lucia, and will deny Defendant's Lucia-related motion to stay consideration of the case.

## IV.  **CONCLUSION**

The ALJ failed to consider evidence relating to Plaintiff's trigger fingers and multiple release surgeries, requiring reconsideration of the opinion evidence offered by Plaintiff's primary care physician and the consultative examiner.  On remand, the ALJ shall also reconsider and explain his consideration of the lay evidence and consider all of Plaintiff's impairments in conducting his Listings analysis.  Finally, if necessary, the ALJ shall obtain additional vocational evidence/testimony after reconsidering the medical, opinion, and lay evidence, to determine if work exists in the national economy that Plaintiff can perform.  Because I find that the ALJ's decision is not supported by substantial evidence, I need not address Plaintiff's challenge to the authority of the ALJ at the time of the original hearing.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MIGUEL COLON     :  CIVIL ACTION
           :
    v.       :
           :
ANDREW SAUL, Commissioner of :  NO.  18-4781
Social Security       :

**O R D E R**

AND NOW, this 26th day of September, 2019, upon consideration of

Plaintiff's request for review (Doc. 14), the response (Doc. 17), the Plaintiff's reply (Doc.

18), and after careful consideration of the administrative record (Doc. 8), IT IS HEREBY

ORDERED that:

1. Judgement is entered REVERSING the decision of the Commissioner of Social Security for the purposes of this remand only and the relief sought by Plaintiff is GRANTED to the extent that the matter is REMANDED for further proceedings consistent with this adjudication;

2. Defendant's Motion to Stay consideration of the case (Doc. 19) is DENIED as moot; and

3. The clerk of Court is hereby directed to mark this case closed.

BY THE COURT:

/s/ Elizabeth T. Hey
_____
ELIZABETH T. HEY, U.S.M.J.